THE FRED W. WOLF COMPANY, Appellee, *vs.* THE MON-
ARCH REFRIGERATING COMPANY, Appellant.

*Opinion filed December 21, 1911.*

1. APPEALS AND ERRORS—*introducing evidence waives alleged
error in denying motion to direct a verdict.* By introducing evi-
dence after a motion to direct a verdict for the defendant, made
at the close of the plaintiff's evidence, is overruled, the defendant
waives the motion and cannot assign the ruling of the court there-
on as error.

2. SAME—*evidence cannot be weighed on motion to direct ver-
dict.* In passing upon the action of the trial court in directing a
verdict for the plaintiff at the close of all the evidence the Su-
preme Court cannot weigh the evidence, but all inferences must
be drawn most favorably to the evidence in favor of the defend-
ant and all evidence contradicting it must be disregarded.

3. SALES—*what acts by purchaser constitute an acceptance of
the goods.* Any act done by the purchaser of goods tendered in
fulfillment of a contract of sale which he would have no right to
do if he were not the owner, constitutes, in itself, an acceptance
of the goods.

4. SAME—*when use of machinery after notice of its rejection
is an acceptance.* Even though machinery bought on approval is
tried, found defective and unsatisfactory and notice of rejection is·
given, yet if the purchaser continues to use the machinery in his
business, such use amounts to a waiver of the right to return the
machinery and an election to accept it.

5. SAME—*when continued use of goods cannot be said to have
been upon invitation of vendor.* The use of a refrigerating plant
by the purchaser after giving notice of rejection because of an in-
ferior engine cannot be said to have been upon the invitation of
the vendor for the purpose of giving the engine a thorough trial,
where such use is continued after the vendor has withdrawn any
such invitation as may have been made, by a letter to the pur-
chaser stating that it has fulfilled the contract, that the plant is
working satisfactorily and that the vendor will assume no further
responsibility for its operation, and demanding immediate payment.

6. SAME—*when evidence as to an intention not to accept plant
is not admissible.* Where the purchaser of a refrigerating plant,
after notice of its rejection and after the vendor has given notice
that it has fulfilled its contract and insists upon payment, contin-
ues to use the plant in its business for its own profit such use is

an unequivocal act of acceptance, which cannot be qualified or explained by showing any different intention on the part of the purchaser, alone.

7. SAME—*when the necessities of a purchaser's business do not change legal effect of using plant.* Where the purchaser of a refrigerating plant fills its storehouse with large quantities of perishable goods during the period allowed by the contract for testing the plant, the fact that such goods will be lost if the use of the plant is discontinued at the end of the period does not excuse the continued use of the plant by a purchaser after notice of its rejection nor qualify the legal effect of such use as an acceptance.

8. SAME—*when purchaser is not entitled to damages by way of recoupment.* Where the contract for the sale and installation of a refrigerating plant expressly provides that an acceptance after the period allowed for the test "shall be in full discharge of the agreements hereinbefore contained," the purchaser cannot, when sued for the purchase price after acceptance, prove a breach of warranty and its damages therefrom, there being nothing in the contract to show that any of the agreements or undertakings of the vendor were not to be regarded as discharged by acceptance.

9. SAME—*the acceptance of a contract may be shown by acts.* Where a contract for the sale of a refrigerating plant provides that acceptance after the period allowed for testing the plant "shall be in full discharge of the agreements hereinbefore contained," the fact of such acceptance may be shown by acts as well as by oral or written statement, there being nothing in the contract making the consequences following acceptance depend upon the manner in which such acceptance is made to appear.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. GEORGE A. CARPENTER, Judge, presiding.

MOSES, ROSENTHAL & KENNEDY, (JOSEPH W. MOSES, and WALTER BACHRACH, of counsel,) for appellant:

The circuit court erred in directing a verdict in favor of appellee for the full amount of its claim, at the conclusion of appellant's evidence, because the evidence tended to show a breach on the part of appellee of the warranties in the

contract and damages resulting therefrom to the appellant, which damages appellant was entitled to recoup under the general issue. *Crabtree* v. *Kile,* 21 Ill. 184; *Strawn* v. *Cogswell,* 28 id. 457; *Owens* v. *Sturges,* 67 id. 366; *Underwood* v. *Wolf,* 131 id. 425; *Prairie Farmer Co.* v. *Taylor,* 68 id. 440.

An acceptance after the test provided for in the contract does not preclude appellant from recouping damages for breach of the warranty that the plant was to be of the best material and workmanship. Such an acceptance has reference only to the agreements as to the working order, condition and capacity of the plant. *Harvesting Machine Co.* v. *Fields,* 90 Minn. 161.

The clause in the contract relating to acceptance did not have the effect of rendering the use by appellant of the plant in controversy an estoppel against appellant from recouping such damages as it sustained by reason of appellee's breach of warranties. Only an express acceptance would have that effect, and then only as to the provision respecting the working order, condition and capacity of the plant. *Underwood* v. *Wolf,* 131 Ill. 425.

The circuit court erred in excluding evidence on behalf of appellant as to the intention of the officers with whom the negotiations for the sale of the plant were conducted by appellee, not to accept the plant in controversy. *Jarrell* v. *Young Co.* 105 Md. 280; *Hale* v. *Taylor,* 45 N. H. 405.

Assuming that by the clause in the original contract, use and operation of the refrigerating plant amounted to a discharge of appellee's agreements respecting the working order, condition and capacity of the plant, yet such clause was waived by appellee's invitation to appellant to operate the plant and give it further trials. *Thresher Co.* v. *Shirmer,* 122 Iowa, 699; *Osborn & Co.* v. *Barker,* 103 Mich. 247; *Kenney* v. *Bevilheimer,* 158 Ind. 653; *Harvesting Machine Co.* v. *Machmuller,* 95 N. W. Rep. 850; *Parsons*

*Band Cutter Co.* v. *Gadeke,* 95 id. 517; *Canham* v. *Plano Manf. Co.* 3 N. D. 229; *Holt Manf. Co.* v. *Dunnigan,* 22 Wash. 134; *Engine Co.* v. *Kennedy,* 7 Ind. App. 502; *Wood Co.* v. *Calvert,* 89 Wis. 640.

Under the facts and circumstances in evidence, appearing from the proof offered by both appellant and appellee, the question as to whether or not there was an acceptance of the plant prior to the 14th day of July, 1904, was a question of fact for the jury, and it was error for the trial court to exclude such issue from the jury and to direct a verdict in favor of appellee. *Norton* v. *Dreyfus,* 106 N. Y. 90; *Jones* v. *Reynolds,* 120 id. 213; *Grabfelder* v. *Vosburg,* 90 App. Div. (N. Y.) 307; *Greenleaf* v. *Hamilton,* 94 Me. 118; *Publishing House* v. *Westinghouse Co.* 72 App. Div. (N. Y.) 121; *Lauer* v. *Richmond Institution,* 8 Utah, 305.

Scott, Bancroft & Stephens, (Frank H. Scott, and John E. MacLeish, of counsel,) for appellee:

An acceptance under a contract of sale may be in full discharge of all warranties contained in the contract, and when a purchaser accepts the performance tendered by the contractor, and the contract provides that an acceptance shall be in full discharge of all agreements contained therein, the purchaser cannot claim damages for breach of warranty. *Brown* v. *Foster,* 108 N. Y. 387; *Underwood* v. *Wolf,* 131 Ill. 425; *Estep* v. *Fenton,* 66 id. 467.

Any act done by a buyer of property delivered under a contract of sale, and which he would have no right to do except as owner of the same, amounts to an acceptance. The plant was operated at a time when, on the undisputed evidence, no license or invitation from appellee so to do existed, and appellant by its continued use of the machinery, and its failure to reject the plant, in writing, at the end of the test run, accepted the same. 24 Am. & Eng. Ency. of Law, 1090; *Underwood* v. *Wolf,* 131 Ill. 425;

*Brown* v. *Foster*, 108 N. Y. 387; *Iron Works* v. *Dodsworth*, 57 Fed. Rep. 556; *Dodsworth* v. *Iron Works*, 66 id. 483; *Fox* v. *Wilkinson*, 133 Wis. 337; *Nichols* v. *Guibor*, 20 Ill. 285.

Where there is a substantial performance by the contractor and an acceptance of such performance by the purchaser, a recovery may be had under the special count alleging performance and acceptance thereof, and a recovery may be had under the common counts where nothing remains to be done but to pay the purchase price for the work and labor performed. *Catholic Bishop* v. *Bauer*, 62 Ill. 188; *Apartment House Co.* v. *O'Brien*, 228 id. 360; *Foster* v. *McEwen*, 192 id. 339; *Fowler* v. *Deakman*, 84 id. 130; *Geary* v. *Bangs*, 138 id. 77.

The evidence showed an acceptance at law. There was no question of fact to submit to the jury. 24 Am. & Eng. Ency. of Law, 1090; *Brown* v. *Foster*, 108 N. Y. 387; *Dodsworth* v. *Iron Works*, 66 Fed. Rep. 483; *Fox* v. *Wilkinson*, 133 Wis. 337.

Mr. JUSTICE DUNN delivered the opinion of the court:

Appellee recoverd a judgment for $13,844.57 against appellant in an action of assumpsit. The Appellate Court affirmed the judgment and granted a certificate of importance and appeal to this court.

The trial court directed the verdict. The action was for the unpaid balance of the consideration of $21,300 agreed to be paid for the construction and installation of a refrigerating plant upon the premises of the appellant. The defense claimed was that the steam engine, which formed an essential part of the refrigerating plant to be furnished, did not conform to the specifications of the contract, and was not of the best material and workmanship as required by such specifications, but was materially defective and was worth $5000 less than the engine specified

in the contract, and that it would cost $5000 to make the engine actually installed conform to the specifications. The appellee's contention was that the appellant had accepted the plant in full discharge of appellee's agreements, and could therefore neither defeat the action nor recoup its damages.

The contract consisted of a written proposal signed by appellee and accepted in writing by appellant. There was a subsequent agreement whereby certain direct expansion piping was to be furnished at an increased price instead of thirty sections of air cooler required by the original contract, but the original contract was not otherwise changed by the subsequent agreement and the rights of the parties in this suit are not affected by it. The appellee's original proposal, which was accepted by the appellant, contained the following:

"We propose to furnish and erect in your building at Chicago, Illinois, in complete working order and condition and of the best material and workmanship, one refrigerating plant of 225 tons refrigerating capacity daily, consisting of the following machinery and material, all as hereinafter specified. * * * It is understood that the plant as above described is to be in complete working order and condition during the month of April, 1903, unless delayed by causes over which we have no control, such as fire, providential interferences, riots, strikes, or civil commotions of any kinds. We agree that the power required to drive the compressor while doing the above work shall not exceed 282 effective horse power at fifty revolutions per minute, providing you furnish condenser water at 60 deg. Fahrenheit, in ample quantity, and that the consumption of fuel necessary to furnish steam to do the work of the engine shall not exceed two and one-quarter pounds of coal per indicated horse power per hour, providing you carry one hundred and fifty pounds boiler pressure and furnish coal which will evaporate eight pounds of water per pound of coal burned. And we agree that this machine, when prop-

erly operated, and when provided with the proper amount of expansion surface, ammonia, etc., and when operated in connection with a power plant of ample capacity, shall be of capacity to perform a refrigerating duty equivalent to the melting of 225 tons of ice during the twenty-four hours of continuous operation. After the plant is started we will furnish an engineer to have charge of the operation of the machine for ten days, during which time we will do the work and produce the temperatures herein specified. While we are in charge you are to furnish all necessary help, together with fuel, light, water, steam, oil, waste, and all other necessary supplies for the successful operation of this plant. At the end of the above mentioned ten days you shall accept or reject the plant, it being understood, however, that if it shall meet the requirements of this proposition it shall be accepted. If rejected you shall notify us in writing thereof, and hereby permit us to enter the premises and remove the same without charge to you and upon refunding to you whatever money has been paid us. An acceptance after the above mentioned period shall be in full discharge of the agreements hereinbefore contained."

The plant was not in complete working order and condition during the month of April, 1903. It was operated for a few days in August, 1903, was then shut down and was again started in April, 1904. It was not claimed that this delay occurred through any fault of the appellee or that the rights of the parties are affected by it. The plant was started in operation April 26, 1904, in charge of an engineer of appellee, and was operated until May 26, 1904. The appellee's engineer was then withdrawn. There was evidence tending to show that the engine was not of the best material and workmanship, but was substantially defective and was worth $5000 less than if it had been in accordance with the specifications; that it could not be made to operate satisfactorily and could not do the work required of it.

252—32

On May 18 the appellee, through Mr. Knuth, its agent, presented to the appellant the following letter addressed to the appellant and requested that it be signed:

"CHICAGO, ILL.,..............:..1904.

*"The Fred Wolf Co., Chicago, Illinois.*

"GENTLEMEN—The refrigerating plant, per our contract dated November 28, 1902, also the expansion pipe covered by our contract dated December 22, 1903, has been installed, except the pipe in one small room in the basement of new building. The fact that the pipe in this room has not been erected is due to no fault of yours, as the room is not yet in condition to have the pipe put in. Your engineer has been in charge of the operation of the plant for the required period and machinery and apparatus is working satisfactorily, and you may treat this as a formal acceptance under such contract. It is understood that the pipe will be installed in the room referred to as soon as we are ready to have the work done.

"Yours very truly."

The appellant's officers refused to sign the letter and handed it back to Knuth, saying they did not propose to accept the plant but must reject it and would so write his firm. Frederick Espert, the secretary and treasurer of the appellant, then told Knuth the trouble with the engine and what was wrong with it, and Knuth said it would be unfair to shut the engine down,—to go ahead and run it and give it a chance to show itself; whereupon Espert said: "Well, if that is your idea,—if that is your request,—we can let the boys run it further, try it out." The next day the appellant wrote the following letter to appellee:

*"May 19, 1904.*

*"Gentlemen*—Referring to your letter of the acceptance left here by your representative yesterday, which relates to the contract dated Nov. 28, 1902, we have this to say: we decline to accept the steam engine, the same is not in accordance with contract and is unsatisfactory to us."

On May 25 the appellee's manager wrote the following letter to the appellant:

*"Gentlemen*—We have furnished all the apparatus and performed all work required of us under the provisions of our contract of November 28, 1902, and of the supplementary contract modifying such original contract, and our man has been in charge of the operation of the apparatus for a considerably longer period

than is provided in such contract. The apparatus is working perfectly and is performing the full duty guaranteed. No difficulties whatever have been experienced with the operation of this apparatus, with the exception of certain adjustments of the governor, which adjustments were made ten days ago. Since that time absolutely no difficulty has been experienced except that which is directly and entirely attributable to lack of sufficient steam pressure. Our engineer reports that on numerous occasions the steam pressure has been allowed to fall seventy-five or eighty pounds. Our contract provides that you shall furnish steam at one hundred and fifty pounds pressure per square inch, and the engine was designed for operation at that pressure. In order to keep the engine going our engineer has on several occasions been compelled to use live steam in the receiver between the high and low pressure cylinders. On Friday last we received a letter from you stating that the engine is unsatisfactory. We wrote you immediately expressing our surprise at receiving such a letter, and asking you to tell us in just what particular you think the engine does not conform to the contract requirements. This letter was received by you either Friday afternoon or early Saturday morning, and as we requested a prompt reply we should have heard from you not later than last Monday. You certainly could not have needed time to consider the matter, since when you wrote us the engine was unsatisfactory you must have known in what particular, if at all, it fails to comply with the specifications in our contract. In passing, we might say that we furnished you just the engine you ordered. Our contract provides specifically that the engine shall be of the Bates Extra Heavy Duty Compound Condensing Corliss type. Before the contract was signed you were shown photographs, blue-prints and cuts of the engine, and all matters pertaining thereto were thoroughly discussed. We know that the engine which we have furnished you complied with the contract requirements in every particular. Knowing, as we do, that we have done each and everything required to be done by us, that we have given you a plant complying in every respect with our contract, and that the time provided in such contract for you to accept or reject the apparatus has passed, we shall assume no further responsibility for its operation. We are sending herewith statement of your account as it appears on our books. This amount is now due us and we shall expect to receive check very promptly."

This letter was handed to the appellant's secretary and treasurer in his office on the day of its date by Mr. Knuth but was not opened or read until the next day, when the following reply was sent: "Yours of the 20th is at hand. We have fully replied to this matter in our letter of the

19th to you." At the time the letter was delivered another conversation occurred with Mr. Knuth substantially the same as that on May 18, previously mentioned. In it Mr. Espert stated the defects in the engine and its working and said that they could not accept it, and to Knuth's question what was to be done about it, answered, "Take it out." Knuth said that was impossible and told him to go on and run it a while; that he was sure it would come out right; that there was always more or less trouble with a new engine, and that the older an engine got practically the better it was, on account of parts having worn smooth and traveling easy.

After May 26 the appellant continued to operate the engine and plant with its own engineer until the bringing of this suit. On May 26 the appellee's attorneys wrote to the appellant that the contracts and all the correspondence had been placed in their hands; that the appellee claimed to have complied with the agreements; that the attorneys were instructed to enforce the appellee's claim, and unless immediate settlement was made would take steps to do so. The appellant replied on May 28, referring to its letter of May 19 as explaining its position in the matter, and saying: "We decline to accept the engine; you can pursue such course as you see fit."

On June 22, while the engine was in operation, a follower-bolt on the piston-head of the high-pressure cylinder broke and the engine was necessarily stopped. Knuth was sent for and came to the plant, and after examining the engine directed that another follower-bolt should be made of tool steel and that any other broken parts should be fixed up, saying: "Go ahead and give her another trial; keep her going; I know she will come out all right." He said: "We will make it all right, Espert; we don't ask you to take this engine until it is all right," to which Espert replied: "All right, Knuth; I may be wrong; I want to be fair in this matter; we will give her another trial." Again,

on July 11 Knuth came to the plant when two bolts had broken. The president of the appellant went down to the engine room with him, showed him the bolts and asked him, "What are you going to do about it?" Knuth said: "We will fix that up all right after a while; that will get along all right; there is plenty of hold in that; there is no such danger there as you think there is going to be.; you just leave the pieces; give her another trial; just keep her going; I will tell you, Espert, that engine is going to come out all right." This suit was begun on July 14.

The first error argued in the appellant's brief is that the circuit court erred in refusing to direct a verdict in favor of the appellant at the conclusion of the appellee's evidence. After this motion was denied the appellant proceeded to introduce evidence. It thereby waived its motion and cannot assign the decision of the court thereon for error. *Geary* v. *Bangs,* 138 Ill. 77; *Joliet, Aurora and Northern Railway Co.* v. *Velie,* 140 id. 59; *Harris* v. *Shebek,* 151 id. 287; *Langan* v. *Enos Fire Escape Co.* 233 id. 308.

Since the verdict was directed for the appellee, all testimony which contradicts that in favor of the appellant must be disregarded and all inferences must be drawn most favorably to it. The evidence cannot be weighed, and if the facts are reasonably capable of a construction favorable to the appellant, such construction must be adopted. It must therefore be regarded as established that the plant delivered did not meet the requirements of the specifications and that the appellant was not bound to accept it. It will be assumed for the purposes of this case, though we do not express any judgment about it, that the letters of the appellant declining to accept the engine constituted a notice, in writing, of the rejection of the plant. The questions then presented are, whether the continued use and operation of the plant, including the engine, by the appellant after its rejection, before suit was brought, constituted, in law, an acceptance of the plant, or whether there is in the record any evidence

reasonably tending to explain such use and operation on some other theory than an acceptance, and whether, if there was such legal acceptance, the appellant thereby, under its contract, waived any claim for damages on account of the appellee's breach of its contract.

It cannot well be contended that the appellant's continued use of the engine after May 26 did not constitute an acceptance of the plant unless the circumstances attending such use so qualified the act as to prevent its having the ordinary effect. The test was completed, the appellee had withdrawn its engineer, claimed to have performed its contract and was demanding payment. The plant was then tendered in satisfaction of the contract. If it conformed to the contract the appellant was bound to accept it. If it did not substantially conform to the contract the appellant had the right to accept or reject it, at its option. If it chose to retain and use the engine it thereby accepted the ownership of it. Any act done by the buyer of goods tendered in fulfillment of a contract of sale, which he would have no right to do if he were not the owner, constitutes, of itself, an acceptance of the goods. (2 Benjamin on Sales,— 4th Am. ed.—sec. 1051; *Cream City Glass Co.* v. *Freidlander,* 84 Wis. 53; *Dodsworth* v. *Hercules Iron Works,* 66 Fed. Rep. 483; *Brown* v. *Foster,* 108 N. Y. 387; *Van-Winkle* v. *Crowell,* 146 U. S. 42; *Chapman* v. *Morton,* 11 M. & W. 534.) Even though the appellant had determined to reject the plant, and though its letters to the appellee and its attorneys be regarded as sufficient notice, in writing, of such rejection, it could not retain possession of the property and use it for its own profit in its business and at the same time insist upon the rejection. The two things are utterly inconsistent. While the appellant is actually accepting and using the plant its words of rejection are unavailing. Where machinery has been bought on approval, tried, found defective and unsatisfactory and notice of rejection has been given, and where, nevertheless, the vendee has continued to

use the machinery, such use amounts to a waiver of the
right to return the machinery and an election to accept it.
*Fox* v. *Wilkinson,* 133 Wis. 337; *Palmer* v. *Banfield,* 86
id. 441; *Stutz* v. *Loyalhanna Coal Co.* 131 Pa. 267; *Ault-
man* v. *Theirer,* 34 Iowa, 272.

It is contended on the part of the appellant that there is
evidence tending to show that the appellant's use of the en-
gine after May 26 was because of the appellee's invitation
to continue the operation of the plant and to give the engine
a further trial, for the purpose of overcoming, if possible,
the appellant's objections to the engine, and that thereby the
appellee waived the acceptance clause of the contract. The
evidence which is supposed to have this effect relates to the
conversation of appellee's agent, Knuth, on May 26, with
the Espert brothers, the president and secretary and treas-
urer of appellant. On this subject Frederick Espert testi-
fied as follows: "We told him that we could not accept the
engine,—that it was no good,—and that sooner or later the
whole thing would blow up. I told him that the bearing on
the compressor end traveled hot and grew hot in its travel,
and that the fly-wheel was not true, and pointed out these
same defects in the cylinder, and the governor did not work
right. That is about as near as I can recollect. It was sub-
stantially the same argument as I had with him on a former
meeting. He said it would be unfair to shut down the en-
gine, and he wanted to know what is to be done with it.
I says, 'Take it out.' 'Well,' he said, 'that would be impos-
sible,' and I said that sooner or later it would have to be
taken out or it would blow up. That is about what was
said. He said, 'You go on and run it for a while; I am
sure that it will come out right; there is always more or less
trouble with a new engine; the older an engine gets prac-
tically the better it is, on account of parts having worn
smooth and travel easy.' That is about the substance of
what he said, and I told him that we had spent about all
the time that we thought was necessary trying to bring the

thing out and we didn't care to experiment any further; that we feared some day there would be a serious accident there. He said, 'Go ahead and run it;' he knew it would wear smooth and come out all right."

Michael Espert testified as follows: "I had a number of subsequent conversations with Mr. Knuth prior to the evening of the day Mr. Knuth left. During the so-called thirty-day period, whenever I would discover any defects in this engine I would call his attention to it. I would go with him to the defect, show it to him, ask his opinion on it and what he thought about it. Mr. Knuth would say, "There is no use of us quarreling over this matter; you know I have had a great deal of experience in engineering; I know that this engine, if it will be kept running,—if you will only agree to give it further trials,—this engine will come out all right.' I said: 'Mr. Knuth, suppose that high-pressure cylinder would give way; we would murder every man in this engine room, wouldn't we?' He says: 'It is impossible; it would not give way,'—that I was wrong. In those interviews I called his attention to the hot bearings on the condenser side of the distance pieces and the way they were bolted up to the high-pressure cylinder. On May 26, the last day of the run, Mr. Knuth came towards us and said: 'I am going to pull my men off; you have your boys run this engine and give her a further trial.' I said: 'Yes, I know; but, Mr. Knuth, your own man here says that the engine here is no good and that we are going to have an accident; do you want me to go right into this thing here and slaughter my men in this engine room?' He says: 'It is all bosh, Espert; don't you know that I have a lot of experience? Don't you think that I am an engineer and that I know my business? You go ahead and run that engine; have your boys run it, and any little thing that breaks, have them fix it; I know that she will wear out all right; you will be perfectly satisfied.' I said: 'Well, Mr. Knuth,

maybe I am mistaken; I am not an engineer nor an expert; if you say so we will try it.' "

Subsequent conversations with Knuth are testified to, occurring on June 22 and July 11, but they need not be referred to here, because if the conversation of May 26 did not tend to show that the appellant's subsequent use of the engine was at the request of the appellee, to enable it to remedy the defects in the engine, then such subsequent use was an acceptance of the plant and the later conversations would not be material. At the very time of this conversation of May 26 Knuth handed to Frederick Espert the letter dated May 25, signed by the appellee's manager, in which he said: "We know that the engine which we have furnished you complied with the contract requirements in every particular. Knowing, as we do, that we have done each and everything required to be done by us, that we have given you a plant complying in every respect with our contract, and that the time provided in such contract for you to accept or reject the apparatus has passed, we shall assume no further responsibility for its operation. We are sending herewith statement of your account as it appears on our books. The amount is now due us and we shall expect to receive check very promptly." On the same day this conversation occurred the appellee's attorneys also wrote to the appellant stating that the appellee claimed that it had complied with its agreements and had instructed the attorneys to proceed to enforce its claim, and that unless immediate settlement was made they would take steps to do so. This letter the appellant answered on May 28 by calling attention to its letter of May 19 as explaining its position, reiterating that it declined to accept the engine, and saying that the appellee might pursue such course as it saw fit.

Whatever view may be taken of the conversation of Knuth, even though it be regarded as a request that the appellant continue to use the engine without being bound by such use as an acceptance, for the purpose of enabling the

appellee to overcome the objections to it, such request could not affect the rights of the parties as they existed after the receipt of the letters from the appellee's manager and its attorneys. If any invitation had theretofore been extended it was then withdrawn. The appellee stated its position to be that it had performed its contract; the time for the appellant to accept or reject had passed; the appellee would assume no further responsibility for the operation of the plant; it demanded payment, and if immediate settlement was not made its attorneys would bring prompt action to enforce it. This declaration terminated any other arrangement. The conversation with Knuth had no tendency to show any waiver on the part of the appellee subsequent to this time. The appellant recognized this situation and stood on its rights. It declined to accept the engine and left the appellee to take such course as it chose. If the matter had rested there a different case would, perhaps, have been presented, but with nothing further said or done by either party the appellant continued to use the engine as if, instead of rejecting, it had accepted it. It was operated in connection with the plant by the appellant's employees, for its benefit and under its sole control. Such application of the engine to its own use with full knowledge of its defects, the appellee refusing any further responsibility for its operation, was, in spite of the express rejection, an election to take the benefit of the contract though executed in an inferior manner to that agreed upon and was an unequivocal acceptance. If it was so, then the subsequent conversations with Knuth three weeks or more after such acceptance are of no importance.

It is urged that the court erred in admitting testimony as to the operation and use of the plant by the appellant after the suit was brought and in rejecting testimony as to the intention of the officers of the appellant not to accept the plant. The testimony admitted did no harm, for it was undisputed that the appellant did use and operate the plant

as its own before suit was brought, and thereby accepted it. The testimony rejected was immaterial, because the undisputed use of the plant was an unequivocal act of acceptance, which could not be qualified or explained by showing any different intention on the part of the appellant, alone. *Brown* v. *Foster, supra.*

The appellant offered to prove that large quantities of eggs, poultry, butter and like products of a perishable nature were stored in its warehouse; that to produce the refrigeration necessary for their preservation required the operation of the machinery furnished by appellee, and that to have shut it down would have resulted in great destruction and loss of such perishable property and great damage to appellant. The necessities of the appellant's business can not relieve it from the terms of its contract. Without regard to the question on whom the loss would eventually fall, the situation was one in which the parties had voluntarily placed themselves. When the appellant filled its warehouse with perishable property it knew that upon the completion of the test it must either accept or reject the plant, and that a rejection would be followed by the shutting down of the whole plant. When the test was completed the appellant might have rejected the plant if not in conformity with the contract, but having done so, the situation which it had voluntarily brought about would not justify its using the plant which it had rejected, either for an actual profit or to save a loss.

It is also urged that the nature, size and weight of the machinery prevented the retention of it from constituting an acceptance of the plant by the appellant. There was here, besides the possession of the property arising out of the ownership of the land on which it was placed, a use of it consistent only with a claim of ownership. The use is such as was held to constitute an acceptance in *Underwood* v. *Wolf,* 131 Ill. 425, and *Dodsworth* v. *Hercules Iron Works, supra.* The contract itself provided that in case of

rejection the plant should be removed, and no reason appears why it is not capable of removal.

It is also contended that the contract required the appellee to remove the plant if it was rejected, and that its continued retention cannot be regarded as an acceptance after the appellee was notified of its rejection. Since we have held that the admitted facts constitute an acceptance and not a rejection of the plant, this proposition is without foundation.

It is insisted that the court should not have instructed the jury to find a verdict in favor of the appellee for the full amount of its claim because the evidence tended to show a breach on the part of the appellee of the warranties in the contract and damages resulting therefrom to the appellant, which it was entitled to recoup under the general issue. It is true that the acceptance of goods bought with an express or implied warranty of quality does not prevent the vendee from showing a breach of the warranty, and his damages, by way of recoupment, thus reducing the sum to be recovered in an action for the price of the goods. (*Underwood* v. *Wolf, supra.*) There is no reason, however, that a vendee may not, if he sees fit, upon his acceptance of the goods, waive any damages for a breach of warranty, or that he may not agree in advance that his acceptance of the goods shall be in full discharge of the contract. This is what was done here. The contract expressly provided that "an acceptance after the above mentioned period" (the ten days' test) "shall be in full discharge of the agreements hereinbefore contained."

It is contended that the acceptance here referred to means an express acceptance, and that the agreements mentioned are only those concerning the working order, condition and capacity of the plant, and do not include the warranty as to materials and workmanship. There is nothing either in the language or nature of the contract to justify this claim. All the agreements of the appellee, except

those for indemnity against patent litigation, including those in regard to material, workmanship, kind, number, quality, time, power and capacity, preceded in the written contract the provision in regard to acceptance. The language is general, and no attempt is apparent to make any distinction among the agreements which are to be regarded as discharged by acceptance. The consequences which follow acceptance are not made to depend upon the manner in which such acceptance is made to appear. The fact of acceptance is the condition upon which the discharge of the agreements is made to depend, and this fact may be shown as fully by acts as by an oral or written statement. The agreement that an acceptance should be in full discharge of agreements may have been unwise for the appellant to make, but a court has no authority to relieve from its obligation.

*Judgment affirmed.*